UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

**GERALD FLOWERS,**

    Plaintiff,

vs.                                                                                   09-CV-569 JAP/SMV

**LEA POWER PARTNERS, LLC,**
**COLORADO ENERGY MANAGEMENT, LLC**
**J.A. FREE, JR. & COMPANY,**
**AFCO STEEL, LLC,**
**BURNS & ROE ENTERPRISES, INC.,**
**MMR CONSTRUCTORS, INC.,**
**L.P.R. CONSTRUCTION CO.,**

    Defendants.
**and**

**LEA POWER PARTNERS, LLC, and**
**COLORADO ENERGY MANAGEMENT, LLC,**

    Third-Party Plaintiffs,

vs.

**L.P.R. CONSTRUCTION CO. and**
**MMR CONSTRUCTORS, INC.**

    Third-Party Defendants.
**and**

**AFCO STEEL, LLC,**

    Third-Party Plaintiff,

vs.

**J.A. FREE, JR. & COMPANY,**
**MMR CONSTRUCTORS, INC.,**
**L.P.R. CONSTRUCTION CO. and**
**BURNS & ROE ENTERPRISES, INC.**

    Third-Party Defendants.

1

**MEMORANDUM OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART
DEFENDANT L.P.R.'S MOTION FOR SUMMARY JUDGMENT ON
PLAINTIFF'S SECOND AMENDED COMPLAINT (Doc. No. 272)**

Defendant L.P.R. Construction Co. (LPR) asks the Court to grant summary judgment dismissing all of the claims brought in PLAINTIFF'S SECOND AMENDED COMPLAINT (Doc. No. 165) (Complaint). Plaintiff Gerald Flowers (Plaintiff) and Defendant MMR Constructors, Inc. (MMR) oppose LPR's motion for summary judgment. [1]

In the Complaint, Plaintiff has asserted two claims: Count I for strict products liability and Count II for negligence in connection with an accident in which Plaintiff fell from a fixed ladder located in the Steam Turbine Building (STB) at the Hobbs Generating Facility (Facility). Because LPR has conceded that there are disputed fact issues as to when the ladder was installed, the Court will deny LPR's motion for summary judgment on Plaintiff's negligence claim. However, LPR, as the installer of the ladder, is not part of the chain of supply of the ladder; hence, the Court will grant the Motion in part and will dismiss Plaintiff's Count I claim against LPR for strict products liability.

I. Background

On May 8, 2008, during the construction of the STB, Plaintiff was working for subcontractor Turnaround Welding Services as a pipefitter on an elevated steel platform in the

---

[1] In ruling on DEFENDANT L.P.R.'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S SECOND AMENDED COMPLAINT (Doc. No. 272) (Motion), the Court also considered DEFENDANT MMR CONSTRUCTORS INC.'S RESPONSE TO DEFENDANT L.P.R. CONSTRUCTION CO.'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S SECOND AMENDED COMPLAINT (Doc. No. 307); PLAINTIFF'S RESPONSE TO L.P.R.'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S SECOND AMENDED COMPLAINT (Doc. No. 317); and L.P.R. CONSTRUCTION CO.'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS AGAINST LPR (Doc. No. 321) (Reply).

STB.  Plaintiff alleges that after ascending the stairs to the platform, he discovered that he had forgotten a tool below.  Instead of using the stairs, Plaintiff used the nearby fixed step-through ladder attached to the platform to descend to the lower level.  As Plaintiff began to descend the ladder, his foot allegedly slipped on an electrical conduit (one-inch pipe) behind the ladder.  Plaintiff alleges that after he slipped, he was unable to stop his fall using the ladder's side rails constructed of angle iron.  Plaintiff also alleges that he was unable to grip the side rail because he hit his hand on a cable tray box abutting the north side rail of the ladder.[2]  Plaintiff fell approximately 15 to 20 feet to the concrete floor, broke his right calcaneus (heel bone), and allegedly suffered back and neck injuries.

In Count I of the Complaint, Plaintiff asserts a claim for strict liability for the defective design and manufacture of the fixed ladder, the electrical conduit, and the cable tray box.  Plaintiff claims that ladder, electrical conduit, and the cable tray box were unreasonably dangerous and defective when they were designed, manufactured, purchased, and installed.  In Count II, Plaintiff asserts a claim for the negligent design, manufacture, and installation of the ladder, the electrical conduit, and the cable tray box.  The evidence shows that the conduit was located 5.75" from the center of the ladder's third rung from the top.  The Occupational Health and Safety Administration (OSHA) has promulgated regulations for fixed ladders, which require the "minimum perpendicular clearance between fixed ladder rungs, cleats, and steps, and any

---

[2] In his deposition, Plaintiff testified that his foot slipped on something and that "the only thing that makes sense" was that he slipped on conduit located behind the ladder and he was unable to keep his grip on the side rails due to their angle and size. (Plf. Resp. Ex. H, Flowers Dep. 68:13-69:6; 75:4-10; 166:5-9.)

obstruction behind the ladder shall be 7 inches." 29 CFR § 1926.1053(a)(13).[3]

Plaintiff's claims are asserted against several Defendants. Defendant Lea Power Partners, LLC (LPP) is the owner of the Facility. Defendant Colorado Energy Management, LLC (CEM) was the Engineering Procurement and Construction Contractor for the construction of the Facility. Defendant LPR installed the fixed platform and the fixed ladder. Defendant MMR Constructors (MMR) installed the electric conduit and the cable tray box. Defendant AFCO Steel, LLC (AFCO) supplied the fixed ladder. Defendant Burns & Roe Enterprises, Inc. (Burns & Roe) designed the ladder. Defendant J.A. Free & Company, Inc. (Free), provided the shop drawings for AFCO. AFCO contracted with General Iron & Steel to fabricate the ladder.[4]

It is undisputed that LPR entered into a contract with CEM to erect the structural steel, including the ladder, within the STB, and CEM supplied the ladder to LPR for installation. It is also undisputed that CEM supplied LPR with the installation drawings and specifications for the ladder and that LPR's scope of work on the ladder was limited to installation of the ladder. Finally, it is undisputed that LPR and CEM performed a "walk through" of LPR's work, and CEM accepted LPR's work on the ladder and the platform.

---

[3] The conduit was located 5.75" from the center of the ladder's third rung (from the top). The cable tray box was abutting the north side rail of the ladder. (Green Report Ex. A AFCO Mot. Part. Summ. J. Doc. No. 285). OSHA regulations require 7" of clearance from the middle of the rungs of a ladder. *See* 29 CFR § 1926.1053 (a)(13) (stating,"[t]he minimum perpendicular clearance between fixed ladder rungs, cleats, and steps, and any obstruction behind the ladder shall be 7 inches. . . ."); 29 CFR § 1910.27 (c)(4) (stating, "[t]he distance from the centerline of rungs, cleats, or steps to the nearest permanent object in back of the ladder shall be not less than 7 inches, . . ."). Defendants, however, have disputed Plaintiff's contention that the Facility was subject to OSHA regulations. *See* Proposed JOINT PRETRIAL ORDER at p. 10.

[4] General Iron & Steel has been dismissed from the case for lack of personal jurisdiction. *See* MEMORANDUM OPINION AND ORDER (Doc. No. 210). J.A. Free, Jr. & Company has not entered an appearance and has not filed an answer or responsive pleading.

However, the timing of the ladder's installation vis a vis the conduit and cable tray box is disputed. LPR alleges that in late January 2008, it assembled the fixed platform on the ground floor and then used chain falls to lift the platform into place. After the platform was secured, LPR attached the fixed ladder. LPR alleges that at the time it installed the ladder, the conduit and the cable tray box had not been installed. However, MMR contends that it installed the conduit and the cable tray box before the ladder was installed. In its Response, MMR contends that four witnesses, three MMR employees and one CEM employee, testified that MMR installed the conduit and the cable tray box prior to LPR's installation of the ladder. (*See* Rios Dep. 50:12-25; 51:1-25; 53:1-20; Hathaway Dep. 32:25--33:11; Mason Dep. 24:3-11; Bell Dep. 72:2-7.) MMR employee, Juan Rios, also testified that in order to install the ladder, LPR had to cut a notch in the cable tray so that the ladder would fit. (Resp. Ex. A, Rios Dep. 52:1-11; 53:9-20.) LPR's employee, Matt Meisenbach, testified that when he left the construction site in early February 2008, all of the ladders had been installed and that no conduit and no cable tray boxes were installed at that time. (Mot. Ex. M  Meisenbach Dep 18:22–19:5; 48:24–49:2.)

LPR seeks summary judgment on both the strict liability and negligence claims against it because: 1) Plaintiff failed to establish that LPR negligently installed the ladder; 2) LPR as a matter of law cannot be held strictly liable as the installer of the ladder; and 3) Plaintiff failed to show that LPR breached any duty to Plaintiff. However, in its Reply, LPR conceded that disputed fact issues preclude summary judgment on the negligence claim; therefore, the Court will deny summary judgment on Plaintiff's Count II negligence claim against LPR. In this MEMORANDUM OPINION AND ORDER, the Court will only address the propriety of summary judgment on Plaintiff's strict products liability claim against LPR. The issue before the Court is whether, as a matter of law, LPR, as the installer of the ladder, is subject to strict

5

products liability for Plaintiff's injuries caused by the allegedly defective ladder.

    II.  Standard of Review

Under Fed. R. Civ. P. 56, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (as stated in rule effective Dec. 1, 2010). The movant may meet its Rule 56 burden by pointing out to the court that the non-movant "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant has met its Rule 56 burden, the burden shifts to the non-moving party to establish the existence of a genuine issue for trial. *Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986).

Because the Court's jurisdiction over this case is based on diversity of citizenship, the Court will apply New Mexico substantive law. *Butt v. Bank of America, N.A.*, 477 F.3d 1171, 1179 (10th Cir. 2007).  If the state's highest court has not addressed a dispositive legal issue, a federal court must determine what decision the state court would make if faced with the same facts and issues by considering state intermediate appellate court decisions, decisions of other states, federal decisions, and the general weight and trend of authority. *Armijo v. Ex Cam, Inc.*, 843 F.2d 406, 407 (10th Cir.1988).

New Mexico adopted the principle of strict products liability based on the Restatement (Second) of Torts Section 402A (1965) in *Stang v. Hertz Corp.*, 83 N.M. 730, 732, 497 P.2d 732, 734 (1972). As set out in *Stang*, Section 402A provides:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
> > (a) the seller is engaged in the business of selling such a product, and
> > (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
> (2) The rule stated in Subsection (1) applies although
> > (a) the seller has exercised all possible care in the preparation and sale of his product, and
> > (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Id. at 732, 497 P.2d at 734.

"The purpose behind the strict products liability doctrine is to allow an injured user or consumer to recover against a supplier or manufacturer without the requirement of proving negligence. This purpose is accomplished by imputing liability for an injury caused by a product to the seller of the product, with or without the presence of negligence on his part." *Trujillo v. Berry*, 106 N.M. 86, 88, 738 P.2d 1331, 1333 (N.M. Ct. App.) (citations omitted), *cert. denied*, 106 N.M. 24, 738 P.2d 518 (1987). "Strict products liability does not, however, preclude liability against a retailer based upon the alternative ground of negligence of the seller where such negligence can be proved." *Id.* Under Section 402A, there are three types of defects: manufacturing defects, design defects, and warning defects. *Fernandez v. Ford Motor Co.*, 879 P.2d 101, 111 (N.M. Ct. App. 1994) (citing *Jiminez v. Dreis & Krump Mfg. Co.*, 552 F. Supp. 301, 303-04 (S.D.N.Y. 1982), *rev'd on other grounds*, 736 F.2d 51 (2d Cir. 1984)).

III.  Discussion

A.  Plaintiff's Strict Products Liability Claim–LPR As A "Mere Installer"

LPR contends that the undisputed facts show its role was limited to the installation of the ladder and the platform to which the ladder was attached. LPR contends that as a matter of law, it is not a "manufacturer, distributor, or seller" of the defective ladder and cannot be held strictly

liable because LPR was not in the ladder's "chain of supply."  (Mem. (Doc. No. 273) at 10; Reply (Doc. No. 321) at 4-9.)  Essentially, LPR argues that it is the provider of a service, not the provider of the ladder itself.  LPR points out that Burns & Roe designed the ladder, AFCO manufactured the ladder, LPP supplied the ladder and the installation specifications to LPR, and CEM, the general contractor, accepted LPR's work after its foreman performed a walk-through of LPR's work. (*Id.*) The Court is not aware of a New Mexico case specifically holding a subcontractor liable for the installation of defective products; therefore, the Court must determine what New Mexico courts would decide based on decisions of other states, federal decisions, and the general weight and trend of authority.  *Armijo*, 843 F.2d at 407 (stating, "[i]f the state's highest court has not addressed the issue presented, the federal court must determine what decision the state court would make if faced with the same facts and issue[]" using decisions of other states, federal decisions, and the general weight and trend of authority).

Generally, strict liability is not applied to an installer who is not also the supplier of the product.  Am. L. Prod. Liab. 3d § 37:11 (2012).  The Restatement (Second) of Torts, § 402A imposes strict liability for defective products, not defective services.  *Parker v. St. Vincent Hosp.*, 1996 -NMCA- 070, ¶ 22, 122 N.M. 39, 45, 919 P.2d 1104, 1110 (Hartz, J.) (upholding dismissal of strict liability claim against hospital for defectively designed surgical TMJ implant because the hospital was not in the "chain of supply" of the medical device).  "Providing negligent services may trigger ordinary negligence or breach of contract actions, . . . but it does not form the basis for actions in strict liability." *Ruiz v. Southern Pac. Transp. Co.*, 638 P.2d 406, 412 (N.M. Ct. App. 1981)(affirming summary judgment dismissing strict liability claim

against railroad because it provided a service not a defective product).[5]  *See also Tanuz v. Carlberg*, 1996 -NMCA- 076, ¶ 11, 122 N.M. 113, 116, 921 P.2d 309, 312 (extending *Parker* and holding that physician-surgeon who chose and placed an implant into patient cannot be held strictly liable for defective implant).

Plaintiff counters that some courts hold installers strictly liable if an installer is found to have created the risk presented by the product, and the product became defective as installed. *See, e.g., Miller v. Solaglas California, Inc.*, 870 P.2d 559, 564-65 (Colo. Ct. App. 1993) (holding that installer of windshield that used silicone to seal windshield instead of urethane provided by manufacturer could be held strictly liable as "manufacturer" within meaning provided in products liability statute);[6] *Court v. Grzelinski*, 72 Ill.2d 141 (Ill. 1978) (allowing suit against dealer who sold car after installing defective gasoline tank); *Brannon v. Southern Illinois Hosp. Corp.*, 386 N.E.2d 1126, 1130 (Ill. App. Ct. 5th Dist. 1978) (upholding verdict against subcontractor who installed a dumb waiter for failing to remove a bar marked for removal which caused the product to become defective); *O'Laughlin v. Minnesota Natural Gas Co.*, 253 N.W.2d 826, 832 (Minn. 1977) (holding seller who installed furnace system strictly liable

---

[5] In *Ruiz*, the plaintiff sued a railroad company for an accident in which his legs were amputated by a train's wheels.  While plaintiff tried to climb over the coupling between apparently stationary train cars, the train jerked and moved forward, and plaintiff fell on the train tracks and was run over by the wheels. 638 P.2d at 408.

[6] The *Miller* court upheld the trial court's denial of a directed verdict in favor of the installer and concluded, "there was sufficient evidence from which reasonable jurors could have concluded that the component parts of the windshield retention system constituted a "product" which Solaglas had prepared for sale to the truck consumer." *Id.* at 565 (citing C.R.S. § 13-21-401(1) (1987 Repl. Vol. 6A)).  The court further upheld a jury verdict because under the statutory definition of a "manufacturer," reasonable jurors "could have found that Solaglas had manufactured a defective windshield retention system." *Id.*

because installer was responsible for selecting, purchasing, and installing furnace unit that was defective when product left hands of installer); *Kopet v. Klein*, 275 Minn. 525, 148 N.W.2d 385 (1967) (upholding strict liability against seller-installer of water softener).[7]

In its Reply, LPR maintains that the cases cited by Plaintiff, *Court*, *Brannon* and *O'Laughlin,* are distinguishable because they involved "hybrid installers." So-called "hybrid installers" are contractors who select and/or sell a product in addition to installing the product. For example, in *Court*, a fireman was allowed to assert strict liability claims against the manufacturer and the dealer of a car for injuries sustained when a defective gas tank exploded because both the manufacturer of the car and the dealer, who installed the gas tank, had worked on the gas tank. 72 Ill.2d at 159-61. In *Brannon*, described *supra*, the Illinois appellate court relied on the fact that the defendant was responsible for supplying as well as installing the elevators and dumbwaiters in imposing strict liability on defendant. *Brannon*, 386 N.E.2d at 1128. In *O'Laughlin*, the Minnesota Supreme Court upheld a ruling of strict liability imposed on a defendant that sold and installed a defective furnace because the defendant fit the definition of a hybrid installer. *O'Laughlin*, 253 N.W.2d at 832. *Compare Malloy v. Doty Conveyor*, 820 F. Supp. 217, 220 (E.D. Pa. 1993) (granting summary judgment dismissing strict liability claim against an installer of conveyer because installer did not select conveyor); *with Hinojasa v. Automatic Elevator Co.*, 416 N.E.2d 45 (Ill. App. Ct. 1980) (reversing jury verdict holding elevator installer strictly liable and limiting *Brannon* as a case imposing strict liability on

---

[7] *See also Lemley v. J & B Tire Co.*, 426 F. Supp. 1378 (W.D. Pa. 1977) (finding that strict tort liability was limited to defects in product supplied and does not include non-negligent mistakes in service); *DeLoach v. Whitney*, 275 S.C. 543, 273 S.E.2d 768 (1981) (ruling that strict liability does not include negligent installation of non-defective product); *Conger v. Teltech, Inc.*, 798 P.2d 279 (Utah Ct. App. 1990) (holding that defendant was not strictly liable for the installation of non-defective spray balls).

installer who was also the seller of a product).

LPR further points out that in *Hinojosa*, the Illinois appellate court limited the holding in *Brannon*. In *Hinojasa*, the Illinois Court of Appeals held that an elevator installer who did not sell or supply the elevator and who installed the elevator according to a third party's plans and specifications cannot be held strictly liable. In *Hinojasa*, the court distinguished *Brannon*,

> [t]he *Brannon* case hinges on the fact that the defendant there was responsible for supplying as well as installing the elevators and dumbwaiters. The *Brannon* court relied on *Court v. Grzelinski* (1978), 72 Ill. 2d 141, 379 N.E.2d 281. In *Court*, the complaint alleged that the defendant sold the used automobile in which it had installed a defective gas tank. The distinguishing factor in *Court* is the fact that the defendant sold the product.

92 A. 2d at 353.

Another Illinois case is illustrative. In *Prompt Air, Inc. v. Firewall Forward, Inc.*, 707 N.E.2d 235, 238-39 (Ill. App. 1 Dist. 1999), Porsche-Galesburg Aircraft Sales (Porsche) contracted with the defendant, Firewall Forward, Inc., for the overhaul of an airplane's engine. The defendant then sent the engine's turbo charger to Kelpak Indus. Inc. (Kelpak) to be overhauled and repaired. After Kelpak negligently completed its work, using automobile parts instead of airplane parts, Kelpak delivered the turbo charger to the defendant. The defendant completed its overhaul of the engine, installed the turbo charger, and returned the aircraft to Porsche. The plaintiff purchased the plane from Porsche. Plaintiff sustained damages during a flight conducted a few months after the plane was purchased. During the flight, the plane's engine lost all power necessitating an emergency landing. *Id.* at 237. The Illinois Court of Appeals held that the both Kelpak and defendant, the installer, were strictly liable for the defective turbo charger because both Kelpak and defendant were part of the chain of supply. *Id.* at 238-39. The court distinguished its holding in *Hinojosa*,

> In *Hinojasa* the manufacturer of the defective product engaged the defendant to install it, and the defendant was required to follow the manufacture's plans and specifications. . . . Had Porsche . . . engaged Kelpak to overhaul the turbocharger and independently hired the defendant to install it, we would have no difficulty in applying *Hinojasa* and finding that, as a mere installer, the defendant is not subject to strict tort liability. In this case, however, it was the defendant who engaged the services of Kelpak. Further, from the affidavit of the defendant's own president, it can be reasonably inferred that the defendant paid Kelpak for overhauling the turbocharger and passed along the cost of that service as part of the "flat rate" it charged Porsche for overhauling the plane's engine.

*Id.*

LPR maintains that under these cases it is a "mere installer" like the elevator installer in *Hinojasa*, because LPR installed the ladder that was manufactured by AFCO according to the plans prepared by Burns. CEM contracted with LPR to install the ladder, which was shipped to the job site, and CEM provided the ladder and installation drawings and specifications to LPR. LPR did not sell the ladder or profit from the sale of the ladder; hence, LPR was outside the chain of production of the ladder. LPR also maintains that it was not a "hybrid installer" because it did not supply the allegedly defective ladder, and LPR did not install a component part into a larger product as in *Prompt Air* (plane turbocharger) and *Miller* (silicone used to install windshield instead of urethane provided by manufacturer).

The Court recognizes that other than the *Parker* and *Tanuz* cases involving medical implants, New Mexico courts have not specifically ruled on whether an installer can be held strictly liable for defects in the item installed. However, the Court agrees with LPR that the policy reasons for strict liability outlined by New Mexico courts as well as an analysis of the cases discussed *supra*, indicate that New Mexico courts would not impose strict liability on a "mere installer."

> [T]he law of New Mexico and the law of other jurisdictions disclose four primary policies supporting the imposition of strict products liability: placing the cost of injuries caused by defective products on the manufacturer who is in a better position to pass the true product cost on to all distributors, retailers, and consumers of the product; relieving the injured plaintiff of the onerous burden of establishing the manufacturer's negligence; providing full chain of supply protection; and, in the interest of fairness, providing relief against the manufacturer who-while perhaps innocent of negligence-cast the defective product into the stream of commerce and profited thereby.

*Brooks v. Beech Aircraft Corp.*, 120 N.M. 372, 377, 902 P.2d 54, 59 (N.M. 1995).

Regarding the first policy, LPR asserts that it bid on the installation as a subcontractor and cannot pass along the cost of defective products installed to a consumer. In addition, LPR claims it has no economic power to influence the other parties in the supply chain to use a particular ladder because LPR did not select the ladder. Also, the second policy is not served by imposing strict liability against LPR because Plaintiff has not demonstrated that proving negligence against LPR is an onerous burden. The third policy is also not effectuated because LPR did not supply the ladder, but instead simply provided a service, installing the ladder according to the plans prepared by another. The fourth policy, regarding the fairness of imposing strict liability on installers, is not advanced because installers profit from their provision of a service and not from casting a particular product into the stream of commerce. The Honorable Tenth Circuit Court of Appeals Judge Harris L. Hartz, as a New Mexico Court of Appeals judge, similarly analyzed the policy factors to hold that a physician and a hospital cannot be held strictly liable for a defective medical implant. *See Tanuz*, 1996-NMCA-076, ¶ 11 (stating, that the court's public-policy analysis of non-manufacturer distributor liability in *Parker* is controlling in case against physician who implanted defective device) and *Parker*, 1996-NMCA-070, ¶ 22 (holding that even though a hospital may engage in business of distributing medical products, policies favoring imposition of strict products liability for

defectively designed products did not justify imposition of such liability with regard to products that were selected by treating physician).

Based on the above policy analysis and the case law from New Mexico and other jurisdictions, the Court will grant summary judgment in part and will dismiss the strict products liability claim against LPR. LPR, as the installer of the ladder, is, as a matter of law, not part of the chain of supply of the ladder.

(1) IT IS ORDERED that DEFENDANT L.P.R.'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S SECOND AMENDED COMPLAINT (Doc. No. 272) is granted as to Plaintiff's Count I strict products liability claim on which a separate Partial Summary Judgment will be entered; and

(2) IT IS ORDERED that DEFENDANT L.P.R.'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S SECOND AMENDED COMPLAINT (Doc. No. 272) is denied as to Plaintiff's Count II negligence claim.

*James A. Parker*
SENIOR UNITED STATES DISTRICT JUDGE